712

## Shepherd Estate

*Edward D. McLaughlin* and *Donald W. Lehrkinder*, for petitioners.

*Joseph W. deFuria*, for respondent.

DIGGINS, J., February 2, 1956.—Roland Reynolds Shepherd, an alleged incompetent, resides at Folcroft and Walnut Streets, Linwood, Delaware County, with his wife, Elizabeth W. Shepherd. His family appears to consist of three children, Elizabeth Mary, Roland and Joseph, two of whom are married. There is also an alleged adopted daughter, Sandra, at home, although this child was not disclosed in the original petition, and the record indicates that she is neither a natural nor an adopted child.

This action is brought under article III, sec. 301, of the Incompetents' Estates Act of June 28, 1951, P. L. 612, 50 PS §1631 et seq., and alleges incompetency, which is denied. The court recognizes that the sole issue before the court is the competency of Roland Reynolds Shepherd. Hearings were held on April 29

and August 10, 1955, and 246 pages of testimony developed. The record discloses the following facts:

Warren Shepherd and Ruth Clements, petitioners, are respectively brother and sister of the alleged incompetent, Roland Reynolds Shepherd, and these three people own as tenants in common a tract of farm land containing approximately 108 acres, situate in the Borough of Brookhaven on the Dutton Mill Road and the Bridgewater or Creek Road. This the parties inherited from their mother in 1940, the land having been in the family since 1908. None of the three, and so far as the record shows, no one else, lives on the land which for all practical purposes is nonproductive.

Warren Shepherd and Ruth Clements, petitioners, are prosperous and successful individuals. Their position regarding this real estate has always been that the value of the land was appreciating greatly each year and they, being in no immediate need of funds, have felt that it was sounder business to hold onto the land. Roland, the alleged incompetent, so far as, economics are concerned, is unsuccessful and poor. True, he has been able to maintain a respectable position in society and has been steadily employed as a watchman in a local industry for the past 15 years earning nominal wages. Although Roland has been in financial need practically all his married life, he never did anything to bring about a partition so that he might sell his land independently.

The record indicates that he never knew that he might do such a thing, always deferring management and supervision to his brother, Warren, and the record also indicates that neither his brother, Warren, nor his sister, Ruth ever explained to Roland his rights, and indeed, at least as to Warren, there is some justification to conclude that he was not forthright with Roland in matters concerning Roland's rights in the land. The record indicates that Warren had told Ro-

land that he, Roland, owned a certain section of the tract, which was the poorest and least usable and salable, and Roland, it appears, had accepted that as a fact. We think that Warren knew that the property was owned as tenants in common, although Warren did specifically deny that he had ever told Roland otherwise and attributed that to the irresponsible misunderstanding on the part of his brother brought about by his limited abilities. Roland contributed nothing toward the maintenance or taxes during all of the years, these being paid by Warren and Ruth since the mother's death in 1940.

So the situation remained until February 7, 1955, when one Harry Shooster, businessman, financier and real estate operator in the City of Chester, dealing directly with Roland Shepherd and his wife, Elizabeth, and being fully cognizant of the fact that Roland owned an undivided one-third share in the whole tract which would be the subject of partition, importuned Roland and his wife to sign an agreement of sale to convey Roland's interest to Mr. Shooster or his nominee for the sum of $10,000, and the evidence in this record discloses that the property is worth upwards of $108,-000, or about $1,000 an acre. This extensive tract is overripe for development and subdivision, lying as it does on the edge of a thriving industrial city, served by all utilities, indeed with suburbia already having passed it on all sides. The record discloses that this was the original offer made by the buyer, there was no dickering, there was no effort made on behalf of the seller to inform himself of the type of his estate or the value of the interest he was selling in the present market.

When this came to light and Warren and Ruth learned of it, they consulted counsel and settlement being imminent, the present petition for the appoint-

ment of a guardian was filed on March 16, 1955, and marked lis pendens the same day that settlement was held, but all counsel of record agreed that the settlement might be had and the funds and the unrecorded deed held in escrow pending the outcome of the present petition, and there is held by the Commonwealth Title Company to no. X273577H, the proceeds and the deed in escrow. The alleged incompetent did not have counsel or anyone acting for him at the settlement.

The record discloses that Roland was born 54 years ago on February 4th, the youngest of three children, at a time when his parents were farming the tract, and it appears from the evidence that Roland's mother had been a school teacher and he attended school only about three or four months of his entire life and this was a school for backward children, and what education he had consisted of making little objects with his hands, being training rather than education. Roland's mother then took over the task of trying to train or educate the boy and apparently spent many patient hours at this task, but the lad had been subject to convulsions from the time he was two years old and under the pressure of training or learning, he would go into a fit of temper resulting in a convulsion. Whether or not these were induced by the resistance to training and learning or the temper seems of little moment. They were convulsions and they began at the age of two and as will be further developed, the more important thing is that he learned nothing. Until he was 17 or 18 years old, he lived as a little child on the farm, playing with a little cart, hauling dirt from one place to pile it up in another and then returning it to its original point or elsewhere. As a child, Roland spent hours playing underneath the front porch with this little cart. At the age of 20, he attempted to make himself employable and in the

course of the first 15 years in the laboring field, he had lost 60 to 75 jobs, even though many of these were predepression years when there was high employment in this area, and it was during this time that Roland got married.

Thereafter, the record shows that Warren and his sister, Ruth, with persistent regularity were called upon to relieve economic stresses. Time after time, Roland would have accumulated rent debts of $500 to $600 which were paid by the family. Such instances, in varying amounts, occurred innumerable times, and frequently the family, in response to telephone calls, would have to send down food to relieve acute conditions. In 1936 or thereabouts, in order to put an end to this inconvenient and uneconomic situation, Warren and Ruth and their mother, who was then alive, arranged to buy a home for Roland in Linwood, the price of which was $2,400. Warren, Ruth and the mother made the down payment and also paid off a $400 lien against the property and arranged it so that the carrying charges would be a modest $10 per month which Roland was expected to pay. Frequently one or the other of the family was called upon to make the $10 payment in order to preserve the property, but eventually the mortgage was paid off. Moneys advanced by the family were forgiven.

In 1946, Roland inherited a net total of $13,000. Within a short time after this inheritance was received, Roland was completely without funds. He could, of course, give no account of what was done with this money but his wife, Elizabeth, who is a woman also of very limited experience and education, gave an account (however, far from the complete accounting suggested by counsel in his brief), in which she explained that at the time they had been burned out and were left with nothing but their automobile and the clothing on their

backs, and had to buy all new furniture, that $500 was spent to buy a truck, $600 was used to pay off the balance on the pleasure car, $1,600 to shingle the house and provide copper stripping around the windows, $750 for clothing, again indicating that this was replacement for clothing burned in the fire, then $565 was spent for a food freezer. She said $3,000 was spent for the furniture and she loaned the son $1,475 to buy an automobile and contended she spent $1,500 for medicine to Dr. Shields for the son who is apparently an epileptic, and then asserted that she paid $100 to have a two-car garage repaired which was blown down in hurricane Hazel, and spoke of a few miscellaneous bills. An analysis of this testimony, however, discloses that the fire which the witness said caused them to lose all of their furniture and clothing had occurred at least 10 years or more before the inheritance because it was at a time when they were living in a rented house which they left in 1936, and a careful reading of the testimony indicates that the so-called accounting was to a large extent irresponsible and in some instances imaginative. The court is convinced that under all of the circumstances, this money was most improvidently and improperly handled by Roland's wife.

Warren Shepherd, petitioner and brother of the alleged incompetent, Ruth Clements, the other petitioner and sister of the alleged incompetent, gave much detailed and important testimony to support the contention that the subject had in the past and might in the future dissipate his estate and become the victim of designing persons, and on this important point Dr. Marshall F. Shields, a neurologist and psychiatrist known to this court, was called, qualified and testified unequivocally that in his opinion, after examination and study, Roland Reynolds Shepherd, the alleged in-

competent, was noneducable and illiterate and that he would be likely to become the victim of designing persons and apt to dissipate his estate.

Contra to this, Dr. Myer Marks, a psychiatrist also known to this court, was called, testified as to his examination, and his conclusion was that Roland was intellectually dull but not incompetent, and that he would not become the victim of designing persons nor likely to dissipate his estate.

Dr. Myer Marks' wife, Dr. Rose W. Marks, a clinical psychologist, was called on behalf of the alleged incompetent, was qualified, testified as to the type of tests given to the alleged incompetent and as a result reached the conclusion that the subject was of normal mentality, intellectually dull, able to handle every day problems adequately and not likely to become the victim of designing persons and able to take care of his ordinary business affairs.

Everyone seems to agree that the subject's I. Q. was low, the psychiatrists fixed it at 89 but admitted that this was speculative because the Wechsler-Bellevue intelligence scale, at least as to performance capabilities, has no criterion for a man aged 54. It is also interesting to note that Dr. Rose Marks gives this subject now a scholastic grade level between second and third grades, and it is hard to conceive that a person of this grade level could approach the responsibility and intelligence necessary to conduct a business affair such as here involved, and seems to run contra to her final conclusion as to his being a normal individual and her contention that he could manage an estate of $10,000, if he came into possesion thereof.

Roland's employer, John W. Walker, of the Philadelphia Quartz Company, was called. He said he had known the subject for about eight years and had had him under his supervision for that time, that he was

a watchman employed to supervise and look after the property holidays, Saturdays, Sundays and nights. This witness came obviously to help Roland and he tried to uphold his mental capabilities, but while on the stand, when this witness realized that these might be misguided efforts, he became much more careful in his appraisal of the subject and it was interesting to note that although he claimed personal knowledge of the man's ability, he just did not know that beyond signing his name, the witness could not read and write, even testifying at first that the subject made out written reports and did a number of responsible things, but later admitted that others had to dial the telephone for Roland when he called inter-plant and stated that while he might get along and maintain his status as a workman, he would be helpless in the hands of a "slicker", and in answer to a question by the court, the witness stated that in doing business, Roland Shepherd would have to rely completely upon the integrity of those with whom he did business, which of course greatly weakened his efforts to sustain the subject's competency.

It is to be noted that Dr. Myer Marks, Dr. Rose Marks and John W. Walker reached their conclusions relying mostly on the fact that the subject was able to make a reasonably good social adjustment and keep out of trouble and raise a family, which could well be, and yet the subject be incompetent within the meaning of the act to transact business and handle his estate without becoming the victim of designing persons, and in spite of this testimony of the psychiatrist, Dr. Myer Marks, and the psychologist, Dr. Rose Marks, these uncontrovertible facts remain:

Throughout the subject's history, while he has at all times been and still is a gentle, lovable soul, he finds himself occupying a position in the economic field

in the lowest salary brackets, working the least desirable of all of the hours, nights, Saturdays, Sundays and holidays only, and having displayed all the years of his adult life not only an inability to handle money, but an almost complete lack of understanding the importance of this commodity in the everyday affairs of life. Indeed, it might be said that so far as money is concerned, he is still engaged in his simple child-like action of handling it as ineffectively as he did the little piles of dirt that were his childhood fascination, permitting it to slip through his fingers just as did the soil with which he played as a child.

Another interesting and, we think, somewhat significant fact in this case is that somewhere along the line, the alleged incompetent and his wife acquired a child, still a minor, which is being raised by them. Roland himself testified that the child was "adopted" but as the subject was developed on the witness stand, it appeared quite evident that no such adoption had been had and finally Roland said in that regard: "Well we had her give to us".

All of these most persuasive factors, it seems to this court, are climaxed, highlighted and culminate in the admitted facts with which Roland is now faced. Having been kept out of the fruits of his inheritance for reasons good, bad or indifferent, by his brother and sister, probably to the point where he had despaired of any practical benefits during his lifetime, he entered into what in our judgment was an irresponsible and improvident agreement, one that a person capable of managing his own affairs would not have done, and one that seems to indicate to us, beyond peradventure of doubt, particularly in light of bygone facts, that Roland is not only likely to dissipate his estate, but unless we intervene and a guardian takes steps, will have already done so.

One factor in this case which needs consideration is the position of Roland's wife. It has been demonstrated that heretofore she handled the financial affairs of the family with, we think, to say the least, no particular degree of competence. On the face of it, one would ask oneself why, if this property is worth $108,000 and Roland has therein a share of approximately $36,000, she would be advocating this sale at $10,000, but when one realizes that the crux of this situation, so far as the wife is concerned, is not how much money Roland will receive as it is who will receive the money and who will have dominion over it, we are convinced that she would rather have $10,000 under her control than that Roland and incidentally herself should have $36,000 under the control of a responsible guardian. We think that the evidence is overwhelming that Roland Reynolds Shepherd is incompetent to handle his business affairs, liable to dissipate his estate and become the victim of designing persons, and that in all fairness and justice to him, as well as to his family, and in view of the fact that in any event he will have some estate to administer, a guardian is necessary.

This is not to say, however, that we think that this land should continue to be held intact simply because Warren and Ruth can afford to hold the investment for further appreciation. We think the guardian may well determine that the ward is entitled to the benefits of this inheritance now and will seek either a purchase by the brother and sister amicably, or a partition. We are not unmindful of the fact that in concluding now that Roland is incompetent and appointing a guardian does not necessarily control the legality of the outstanding agreement with Shooster, but conceivably the guardian would feel it its duty to challenge this contract on grounds in its judgment

sufficient, among which is the fact that its ward did not have sufficient knowledge of what he owned with which to measure up to the required meeting of the minds in a contractual relationship. These questions, of course, we do not here decide.

Under the act, the court is not restricted to the appointment of a guardian only in situations where the person is so insane that he cannot distinguish between right and wrong. This act evidences the enlightened concept of the law which protects a person where he cannot protect himself. It is not required that a person should be pronounced simpleton, lunatic or idiot before this act becomes operative to protect a citizen. All that is necessary under the terms of the act itself is that a person, because of mental deficiency, is unable to manage his property or is liable to dissipate it or become the victim of designing persons.

We think this subject fits all three and we therefore make the following

*Decree Nisi*

And now, to wit, this February 2, 1956, at 4 p.m., after hearing in open court, the court finds that Roland Reynolds Shepherd is an incompetent within the meaning of section 102 of the Incompetents' Estates Act of 1951 and The Philadelphia National Bank (Chester-Cambridge Office) is hereby appointed guardian of his estate.

*Order*

The prothonotary is directed to give notice immediately to the parties or their attorneys of record of the filing of the foregoing decree nisi and if no exceptions be filed thereto within 10 days after the service of such notice to enter the decree nisi as a final decree.